UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
ANTHONY DEFALCO and ERIC TRANTEL,

                        Plaintiffs,

                                                    **MEMORANDUM & ORDER**
            - against -                              15-CV-7369 (PKC) (RML)

MTA BUS COMPANY, MTA POLICE
DETECTIVE BRIAN LONGARO, and
FRANCIS BRISTOW,

                        Defendants.
-------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

        On December 28, 2015, Plaintiffs Anthony Defalco and Eric Trantel brought this action

against Defendants MTA Police Detective Brian Longaro, Francis Bristow, and others[1], alleging

violations of 42 U.S.C. § 1983 in connection with Plaintiffs' arrest, prosecution, and suspension

of employment.  Following the Second Circuit Court of Appeals' vacatur and remand of this

Court's decision granting Defendants Longaro and Bristow summary judgment, these Defendants

and Defendant MTA Bus Company renewed their motion for summary judgment and also asked

the Court to rule on a related motion to strike an affidavit previously submitted in support of

Plaintiffs' opposition to Defendants' summary judgment motion.  For the reasons that follow, the

Court denies Defendants' motions in full.

---

        [1] Plaintiffs' original complaint also named Henry Micyk, John McGovern, Butch Miller, Tom Losito, and the MTA Police Department as Defendants, but on December 14, 2017, Plaintiffs withdrew their claims against these defendants.  (Stipulation of Dismissal, Dkt. 47.)

## BACKGROUND

### I.     Undisputed Facts[2]

#### A.     The Beginning of the Battery Theft Investigation

At the time of events relevant to this lawsuit, Plaintiffs were employed as "helpers" for MTA Bus Company ("MTA Bus"), and in that role, their duties included, among other things, going to depots to pick up parts, helping mechanics, fueling buses, working with bus parts, loading and unloading trucks, and working with batteries.  (Defendants' 56.1 Statement ("Defs.' 56.1"), Dkt. 56, ¶¶ 1–2.)  Both Plaintiffs were working at the MTA Bus JFK Depot (the "Depot"), though Defalco was only stationed there temporarily due to Hurricane Sandy; he ordinarily worked at the MTA Bus Far Rockaway Depot.  (Id. ¶¶ 3–4.)  Defendant Bristow worked as a Foreman, also referred to as a "Maintenance Supervisor" or "Line Supervisor," and in that role, his responsibilities included oversight of MTA Bus employees assigned to maintain buses at the Depot, including oversight of helpers and mechanics.  (Defendants' Supplemental 56.1 Statement ("Defs.' Supp. 56.1"), Dkt. 77, ¶ 63.)

During a meeting on September 27, 2012, Bristow reported to John McGovern, Director of Internal Studies & Operations Improvement at MTA Bus's internal security department; Robert

---

[2]  Unless otherwise noted, a standalone citation to a party's 56.1 statement denotes that this Court has deemed the underlying factual allegation undisputed.  Any citation to a 56.1 statement incorporates by reference the documents cited therein; where relevant, however, the Court may cite directly to an underlying document.  The Court has deemed facts averred in a party's 56.1 statement to which the opposing party cites no admissible evidence in rebuttal as undisputed.  *See Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 12, 2012) ("Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence.  Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything." (emphasis in original)).  Additionally, to the extent a party's 56.1 statement "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party] without specifically controverting those facts," the Court has disregarded the statement.  *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012).

Picarelli, Chief Officer of the MTA Bus's internal security department; Albert Pignataro, Director in the MTA Bus's internal security department; and John Dhuman, an Assistant General Manager at the Depot that bus batteries were being stolen by MTA Bus employees. (*See* Defs.' 56.1, Dkt. 56, ¶ 6; Oct. 12, 2012 McGovern Mem., Dkt. 57-9.) Bristow told McGovern that he had been notified about the thefts by three other MTA Bus employees, Doodnath Seecharan, Maniram Sukhee, and Balmore Hamilton, and provided McGovern with their cell phone numbers. (*See* Defs.' 56.1, Dkt. 56, ¶ 7; Bristow Deposition ("Bristow Dep."), Dkt. 60-43, at 55:14–56:16, 57:23–58:6.)[3] MTA Bus's internal security department began an investigation based on Bristow's report. (Defs.' 56.1, Dkt. 56, ¶ 9.)

During the September 27, 2012 meeting, McGovern told Bristow that, going forward, he should "[k]eep an eye out for anyone removing batteries from the Depot without authorization." (Bristow Dep., Dkt. 60-43, at 57:12–17.) Bristow interpreted McGovern to mean that he (Bristow) should make sure that batteries were not being removed by anyone without authorization, and so, each day he worked, Bristow counted the number of pallets in the battery storage area and reported that information to McGovern by phone. (*Id.* at 58:7–59:22.) Bristow also provided MTA Bus investigators and the MTA Police Department ("MTAPD") with employees' phone numbers and work schedules. (Plaintiffs' 56.1 Statement ("Pls.' 56.1"), Dkt. 59, at 8, ¶ 9.)

Between September and December 2012, Bristow made several reports to McGovern related to battery theft. (Defs.' 56.1, Dkt. 56, ¶ 10.)

- On October 2, 2012, Bristow called McGovern to report that a co-worker informed him that Depot employee Alexis Pastor had placed a pallet of batteries on Truck 68, left the Depot in the truck, and was missing for an hour. (Oct. 12, 2012 McGovern Mem., Dkt. 57-17.)

---

[3] The Court assumes that Bristow's deposition testimony about "Lloyd" Hamilton refers to the same individual identified elsewhere in the record as "Balmore" Hamilton. (*See, e.g.*, Dec. 12, 2012 McGovern Mem., Dkt. 60-8; Hamilton Affidavit, Dkt. 60-35.)

- On October 27, 2012, Bristow called McGovern to report that Pastor left the Depot in Truck 68. (Oct. 29, 2012 McGovern Mem., Dkt. 57-12.) In response, McGovern "immediately" located the truck using a GPS tracking system and set up surveillance for several hours, which ultimately proved unremarkable. (*Id.*) During a follow-up call that same day, Bristow reported that Pastor had returned to the Depot in Truck 68, but that prior to his departure, Bristow had seen him and another mechanic, Felix Rodriguez, near the battery area. (*Id.*) Bristow also indicated that that Pastor left the Depot during his lunch break. (*Id.*) McGovern told Bristow to call him if he observed Truck 68 exiting the Depot. (*Id.*)

- On November 16, 2012, McGovern interviewed Bristow by phone regarding Bristow's report, which was initially made to Dhuman, that an MTA employee told him (Bristow) that Pastor and Rodriguez had removed three pallets of batteries from the Depot. (Nov. 21, 2012 McGovern Mem., Dkt. 57-13.) McGovern checked the GPS tracking system and did not identify anything remarkable. (*Id.*)

- On November 27, 2012, Bristow called McGovern again regarding his report on the events of November 16, and explained that Pastor and Rodriguez were involved in removing three pallets of batteries from the Depot, and that the batteries were loaded onto a white box truck by Plaintiff Trantel, using a forklift. (Nov. 28, 2012 McGovern Mem., Dkt. 57-11.)

On December 6, 2012, McGovern spoke to MTAPD Detective Henry Micyk about the battery theft investigation. (Defs.' 56.1, Dkt. 56, ¶ 12.) That same day, Micyk was assigned to the investigation and briefed by McGovern and Picarelli. (*Id.* ¶ 20.)

On December 7, 2012, Bristow called McGovern and reported that a co-worker had informed him that Pastor and Rodriguez had removed a pallet of batteries from the Depot, assisted by Plaintiff Trantel, who loaded the pallet onto the truck. (*See* Defs.' 56.1, Dkt. 56, ¶ 13; Dec. 7, 2012 McGovern Mem., Dkt. 57-10.)

**B.     The Events of December 8, 2012**

On December 8, 2012, at 12:12 p.m., Bristow called McGovern to report that he "suspected" Plaintiff Trantel was going to remove batteries from the Depot; in response, McGovern told Bristow to gather as much information as possible and to keep him updated. (Defs.' 56.1, Dkt. 56, ¶ 14; Dec. 10, 2012 McGovern Mem., Dkt. 57-15.) McGovern recorded that

he immediately contacted Micyk and advised him of the situation.  (Dec. 10, 2012 McGovern Mem., Dkt. 57-15.)

Then around 4:40 p.m. that afternoon, Bristow received a call from his supervisor, Orin Blackman, who told him to check out what was happening in the engine wash area, where he (Blackman) had observed an MTA vehicle, a forklift, and Plaintiff Trantel washing or dealing with batteries.  (*See* Bristow Dep., Dkt. 60-43, at 147:23–148:4, 152:11–23; Deposition of Orin Blackman ("Blackman Dep."), Dkt. 60-50, at 87:11–89:4.)[4]  Bristow went to the fuel station office to observe the engine wash area.  (Bristow Dep., Dkt. 60-43, at 155:22–156:16.)  He then called Blackman to report his observations, and Blackman directed him to prepare a report.  (*Id.* at 173:4–174:25.)  Bristow's report states that after receiving the call from Blackman at 4:40 p.m. he

> immediately went to the fu[e]l station office, look[ed] through the glass door and observed Eric Trantel placing a skid pallet with Batteries on Truck #67, and the driver of said vehicle was Edwin De[f]alco[,][5] who left the depot and ma[d]e a right on Rockaway Blvd at 1645 and return[ed] to the depot at 1730hrs.
>
> Either Eric A. Trantel or Edwin De[f]alco was not authorized to remove any batteries from the JFK Depot.[6]

(Dec. 8, 2012 Bristow Report, Dkt. 60-28.)  On December 8, 2012, Bristow did not have the power to authorize a helper to move batteries outside the Depot.  (Pls.' 56.1, Dkt. 59, at 10, ¶ 25.)  Additionally, on December 8, 2012, Bristow was not Defalco's supervisor,[7] did not talk to any of

---

[4]  Blackman testified at deposition that he called Bristow because he thought it was strange that there was a vehicle parked near the engine wash area because batteries were typically moved "from point A to point B" using a forklift.  (Blackman Dep., Dkt. 60-50, at 88:2–23.)

[5]  Plaintiff Defalco was later identified as "Anthony," not Edwin.

[6]  The Court interprets this statement to mean that Bristow believed that *neither* Plaintiff Trantel nor Plaintiff Defalco was authorized to remove batteries from the Depot.

[7]  Bristow was also not Defalco's supervisor at any other time, as they were assigned to different depots with different command structures.  (Pls.' 56.1, Dkt. 59, at 10, ¶ 24.)

Defalco's supervisors, did not review Defalco's assignment sheet, and had no knowledge of what Defalco was assigned to do that day. (Pls.' 56.1, Dkt. 59, at 10, ¶¶ 24, 26.)

On December 10, 2012, Bristow called McGovern to report that on December 8, Trantel had placed a pallet of batteries onto Truck 67 using a forklift, that Truck 67 was operated by Defalco, that the truck left the Depot with the batteries at 4:45 p.m. and returned at 5:30 p.m., and that neither Trantel nor Defalco was authorized to take batteries from the Depot. (Defs.' 56.1, Dkt. 56, ¶ 15.) Two days later, on December 12, Micyk interviewed Bristow, with McGovern present, about what he reportedly witnessed on December 8, 2012. (*Id.* ¶ 21.) Bristow provided a written statement regarding the events of December 8 that was consistent with his report to Blackman, including that he had looked "through the glass door" of the fuel station office and observed Plaintiffs Trantel and Defalco remove batteries from the Depot, and that neither was authorized to do so. (*See id.* ¶ 22.) Bristow also reported that he first learned of possible battery theft at the Depot in September 2012, but that the December 8, 2012 incident was the first he had witnessed himself. (*Id.* ¶ 23.) Micyk recorded this information in his case file. (*Id.* ¶ 24.) McGovern's memorandum of the meeting states that Bristow indicated that Seecharan, Sukhee, and Hamilton had witnessed battery theft at the Depot. (Dec. 12, 2012 McGovern Mem., Dkt. 60-8, at ECF[8] 5.)

## C.    The Battery Theft Investigation Continues

On January 7, 2013, Micyk called Bristow to see if he had observed any further suspicious activity at the Depot; Bristow responded that he had not, nor had he received any further reports of suspicious activity. (Defs.' Supp. 56.1, Dkt. 77, ¶ 78.) Then, on February 5, 2013, McGovern contacted Micyk regarding a complaint from a woman who reported that several days earlier an

---

[8] "ECF" refers to the pagination generated by the court's CM/ECF docketing system and not to the document's internal pagination.

MTA Bus and a silver Chevy SUV had blocked her home, and that she had observed rectangular shaped items wrapped in plastic being transferred from the bus to the SUV. (*Id.* at ¶ 79.) McGovern also informed Micyk that Bristow had advised him that Pastor had removed a bus from the Depot when he was allegedly on a break and then returned the bus a short time later. (*Id.*)

On February 18, 2013, Bristow contacted Micyk to inform him that, on February 16, he had observed Pastor load two bus batteries into a white Chevy Trailblazer SUV that was parked in the employee parking lot at the Depot. (*Id.* at ¶ 80.)

On February 26, 2013, the battery theft investigation was transferred from Micyk to MTAPD Detective Brian Longaro, who received and reviewed all of Micyk's investigative file, including emails prepared by McGovern going back to Fall 2012. (*See* Defs.' 56.1, Dkt. 56, ¶ 25; Defs.' Supp. 56.1, Dkt. 77, ¶ 81.) Longaro contacted both McGovern and Bristow. (Defs.' 56.1, Dkt. 56, ¶ 26; Mar. 5, 2013 MTAPD Incident Report, Dkt. 60-18, at ECF 1 ("At approximately 1400 hours, I contacted Supervisor Francis Bristow in regards to this investigation").)

On March 11, 2013, McGovern reported to Longaro that Bristow had contacted him over the weekend to report that he had seen another MTA Bus employee, Vincent Williams, remove batteries from the Depot on March 9, 2013. (Defs.' 56.1, Dkt 56, ¶ 27; Defs.' Supp. 56.1, Dkt. 77, ¶ 82.) That same day, Bristow himself contacted Longaro, and not only detailed his observations of Williams over the weekend, but also reported his observation of suspicious activities by Pastor and Rodriguez. (Defs.' Supp. 56.1, Dkt. 77, ¶ 82; MTAPD Incident Report, Dkt. 57-7, at ECF 39.) Longaro conducted surveillance at the Depot on March 11, 2013, and ultimately arrested Williams, who admitted that he had been stealing batteries and oil from the Depot. (Defs.' 56.1, Dkt 56, ¶ 27; MTAPD Incident Report, Dkt. 57-7, at ECF 39–40.)

### D.     Plaintiffs are Arrested

On March 13, 2013, Longaro and his partner, MTAPD Detective Edward Russell, arrested Plaintiff Defalco.  (*Id.* ¶ 28.)  Upon arrest, Longaro interviewed Defalco about the events of December 8, 2012, and noted in his report that Defalco denied any involvement in removing batteries from the Depot, but acknowledged helping Plaintiff Trantel wash down batteries.  (Mar. 13, 2013 MTAPD Incident Report, Dkt. 60-21, at ECF 4.)  According to Longaro's report, Defalco stated that on December 8, he left the Depot with his supervisor "Vinny," whom he dropped off at Baisly Park Depot before picking up three batteries to transport to JFK.  (*Id.*)  The report further notes that Defalco told Longaro that two mechanics, Chicco Boodhai and Sal Martinelli, were taking scrap metal from the Depot, that mechanic Vincent Williams was taking oil from the Depot, and that Pastor and Rodriguez had taken numerous batteries from the Depot.  (*Id.* at ECF 5.)  Following the interview with Defalco, Longaro contacted Bristow with Defalco's version of events; Bristow recounted again, with additional detail, how on December 8, 2012, he had observed Trantel place a pallet of 16 new, sealed batteries in the back of Truck 67, which Defalco then drove out of the Depot alone.  (*Id.*)  That same day, Longaro signed a criminal complaint charging Defalco with Grand Larceny in the Fourth Degree and Criminal Possession of Stolen Property in the Fourth Degree based on the events of December 8, 2012.  (*See id.*; Defs.' 56.1, Dkt 56, ¶ 35; Defalco Criminal Records, Dkt. 57-34, at ECF 3–5.)

On March 14, 2013, Detective Russell contacted a scrap metal purchaser and learned that both Williams and Boodhai had accounts with the scrap metal purchaser and had sold bus batteries and other materials to it.  (Defs.' Supp. 56.1, Dkt. 77, ¶ 87.)  That same day, Longaro arrested Plaintiff Trantel.  (Defs.' 56.1, Dkt. 56, ¶ 31.)  The following day, March 15, 2013, Longaro signed a criminal complaint charging Trantel with Grand Larceny in the Fourth Degree based on the events of December 8, 2012.  (*Id.* ¶ 35; Trantel Felony Compl., Dkt. 57-19.)  Defalco and Trantel

were arraigned in Queens County Criminal Court on these charges on March 14 and March 15, 2013, respectively.  (*See* Defalco Criminal Records, Dkt. 57-34, at ECF 2; Mar. 14, 2013 MTAPD Incident Report, Dkt. 57-7, at ECF 57–58.)

On March 22, 2013, Bristow met with MTAPD Detective Rhiannon McDermott and provided a written statement regarding his observations of Pastor on February 16, 2013.  (*See* Defs.' Supp. 56.1, Dkt. 77, ¶ 90; Mar. 22, 2013 MTAPD Incident Report, Dkt. 57-7, at ECF 64.) Pastor was arrested that day and charged with Petit Larceny and Criminal Possession of Stolen Property in the Fourth Degree.  (Defs.' Supp. 56.1, Dkt. 77, ¶ 90.)  On May 5, 2013, Pastor pled guilty to disorderly conduct.  (*Id.*)  On October 6, 2014, the cases against Plaintiffs Defalco and Trantel were dismissed and sealed by the court.  (Defs.' 56.1, Dkt 56, ¶ 41.)[9]

## II.    Disputed Facts

To start, the parties have a fundamental dispute over what happened on December 8, 2012. By Bristow's account, Plaintiff Trantel placed a pallet of batteries on Truck 67, which Defalco, who was alone in the truck, then drove out of the Depot, without authorization.  (*See* Dec. 8, 2012 Bristow Report, Dkt. 60-28; Bristow Dep., Dkt. 60-43, at 168:7–169:21.)  Trantel maintains that on December 8, 2012, Plaintiff Defalco was helping him "re-skid"[10] batteries when the two men accidentally dropped a battery, causing it to leak onto other batteries.  (Trantel Affidavit ("Trantel Aff."), Dkt. 60-37, ¶ 5.)  Trantel and Defalco then took two skids of batteries to the engine wash area to wash off the acid; Trantel transferred one skid using a forklift, while Defalco transferred another skid using a truck.  (*Id.* ¶¶ 6–7.)  Defalco backed the truck into the engine wash area, so

---

[9]  The Court does not recount Plaintiffs' post-arrest employment proceedings as these facts are not relevant to any claims currently before the Court.

[10]  The Court understands "re-skid" to refer to the process of putting batteries onto a "skid" or pallet.  (*See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, Dkt. 58, at 1.)

that Trantel could unload the skid with the forklift.  (*Id.* ¶ 8.)  Defalco agrees with Trantel's account, and adds that when he left the Depot, he did so at the instruction of his supervisor Vinny Hernandez, who asked him to go to Baisley Park to pick up "red top" batteries, and to give him a ride to the bus stop near Baisley Park.  (*See* Defalco Affidavit ("Defalco Aff."), Dkt. 60-36, ¶¶ 2–6, 9; Pls.' 56.1, Dkt. 59, at 9, ¶ 15.).  Defalco maintains that when he left the Depot he was with Hernandez and there was nothing in the back of the truck.  (*See* Defalco Aff., Dkt. 60-36, ¶ 9.)  Hernandez's affidavit is consistent with Plaintiffs' version of events, including that he and Defalco left the Depot together on December 8, 2012 to go to Baisley Park, and that there were no batteries in the truck bed.  (*See* Hernandez Affidavit ("Hernandez Aff."), Dkt. 60-39, ¶¶ 12–14.)

Another core dispute centers on the parties' disagreement over Bristow's vantage point and sightline on December 8, 2012.  Bristow testified at deposition that on December 8, he looked through the "huge glass window" in the fuel station office, which is to the right of the office door.  (Bristow Dep., Dkt. 60-43, at 156:3–16, 158:9–16.)  However, Bristow's December 8, 2012 report to Blackman and his December 12, 2012 written statement to Micyk both stated that he looked through "the glass door" of the fuel station office.  (*See* Dec. 8, 2012 Bristow Report, Dkt. 60-28; Defs.' 56.1, Dkt. 56, ¶ 22.)[11]  Bristow also testified that the back of the truck was approximately 10 feet from the entrance of the engine wash area, about 3 feet away from the fuel station office, and that from his vantage point he could see "[t]he complete truck, from the back to the front."  (Bristow Dep., Dkt. 60-43, at 164:23–166:25.)  Plaintiffs maintain that on December 8, 2012, Defalco parked the back of Truck 67 no more than five feet from the engine wash door.  (Pls.' 56.1, Dkt. 59, at 9, ¶ 15.)  Plaintiffs argue that from the vantage point of the glass panel in the fuel

---

[11]  The Court notes that, based on photographs submitted by both parties, the fuel station office appears to have a glass window and a door with a glass panel, both of which look out onto the engine wash area.  (*See* Dkt. 60-32, at ECF 11; Dkts. 76-1, 76-15.)

station office door it is not possible to see anything happening five feet from the engine wash door because a wall obstructs the sightline. (*Id.* at 9, ¶ 16.) Both parties submitted photographs purporting to resolve the question of Bristow's vantage point and sightline on December 8, 2012. (*See* Dkt. 60-32; Dkts. 76, 76-1–76-16.)

Relatedly, the parties dispute Longaro's knowledge of Bristow's vantage point and sightline on December 8, 2012. Plaintiffs argue that Longaro "knew" that Bristow could not have looked through the glass panel in the fuel station office door and seen Plaintiffs allegedly stealing batteries, pointing to Longaro's deposition testimony that he "observed the location where [Bristow] was standing and what location the theft was occurring from, to see if there was an actual view from that location." (Pls.' 56.1, Dkt. 59, at 13, ¶ 40; *see also* Longaro Deposition ("Longaro Dep."), Dkt. 60-44, at 146:19–147:13.) Defendants dispute that Longaro ever went to the Depot to observe the scene of the crime. (Defendants' Response to Plaintiff's 56.1 ("Defs.' Resp. 56.1"), Dkt. 64, ¶ 40.)

The parties also dispute the veracity of Bristow's statements to investigators and the MTAPD that Seecharan, Sukhee, and Hamilton had reported battery thefts at the Depot to him. (*See* Bristow Dep., Dkt. 60-43, at 55:14–23; Dec. 12, 2012 McGovern Mem., Dkt. 60-8, at ECF 5.) Plaintiffs aver that Bristow knowingly provided investigators with false information about battery thefts, pointing to affidavits from Seecharan, Sukhee, and Hamilton, each of whom state, "[a]t no time during my employment for MTA Bus Company have I ever witnessed any employee stealing bus batteries or any other item" and "[a]t no time during my employment for MTA Bus Company have I ever told Francis Bristow or anyone else that I witnessed any employee stealing bus batteries from JFK Depot." (Pls.' 56.1, Dkt. 59, at 8, ¶ 12; Sukhee Affidavit ("Sukhee Aff."), Dkt. 60-33, ¶¶ 2–3; Seecharan Affidavit, Dkt. 60-34, ¶¶ 2–3; Hamilton Affidavit, Dkt. 60-35, ¶¶ 2–3.)

Defendants respond that Plaintiffs provide "no evidence that Bristow provided any information that was false" or that he "knew [to be] false." (Defs.' Resp. 56.1, Dkt. 64, ¶ 12.)

Further, the parties dispute what, if anything, Longaro knew about the possible unreliability of Bristow's secondhand reports of battery thefts. Plaintiffs argue that prior to Plaintiffs' arrests, "there were circumstances that raised doubts as to Bristow's veracity," and point to Sukhee's affidavit, in which he states that shortly after Williams was arrested he "received a phone call from someone who identified himself as a MTA police officer" who asked if Sukhee was aware of what was going on at the shop. (*See* Pls.' 56.1, Dkt. 59, at 12–13, ¶¶ 38–39; Sukhee Aff., Dkt. 60-33, ¶¶ 5, 7.) Sukhee states: "I told [the officer] that I had heard about Vinny [Williams]'s arrest. Then, he asked me if I had ever witnessed any theft at the Depot, and I told him I had not. He thanked me and we hung up." (Sukhee Aff., Dkt. 60-33, ¶ 7.) Defendants respond that Plaintiffs fail to cite evidence that *Longaro* called Sukhee and that Longaro's case file does not reflect that he called Sukhee. (Defs.' Resp. 56.1, Dkt. 64, ¶¶ 38–39.)

The parties additionally dispute the information Longaro relied upon in deciding to arrest Plaintiffs. Defendants maintain that Longaro decided to arrest Plaintiff Defalco based on "the evidence he had gathered in the investigation, including the statement and information provided by Bristow." (Defs.' 56.1, Dkt 56, ¶ 40.) Meanwhile, Plaintiffs maintain that "[t]he only evidence Longaro relied upon was Bristow's statement" (Pls.' 56.1, Dkt. 59, at 5, ¶ 40) and that

> [n]one of Longaro, Micyk, or McGovern's investigative efforts (including placing a GPS on Defalco's truck, subpoenaing Trantel's phone records, interviewing confessed thief Vinny Williams, searching for accounts belonging to Plaintiffs at a scrap metal business, conducting background checks on Plaintiffs, placing pole cameras at the depot exits, reviewing inventory reports, and repeatedly surveilling the depot) yielded any evidence whatsoever implicating Plaintiffs in battery theft at the depot.

(*Id.* at 14, ¶ 47).[12]  Defendants respond that "[t]he investigative efforts yielded an eyewitness to the December 8, 2012, theft (Bristow), whose report of other thefts at the depot was later substantiated."  (Defs.' Resp. 56.1, Dkt. 64, ¶ 47.)

For his part, Longaro testified at deposition that he arrested Plaintiff Defalco based on "the evidence gathered in this investigation," which he described as "[t]he statement from Bristow," "the information provided [by] Bristow," and no other information.  (Longaro Dep., Dkt. 60-44, at 169:12–25.)  Longaro similarly testified that his decision to arrest Plaintiff Trantel was based on "a complaint from Bristow stating that he observed Trantel stealing batteries from the bus depot" and nothing else.  (*Id.* at 190: 2–12.)  Longaro further testified that he felt he could rely on Bristow's statements because "[h]e's an  . . . MTA Bus [] supervisor who reported the theft to Transit Security and then it was reported to [the MTAPD]."  (*Id.* at 170:2–7.)  Additionally, Longaro testified that he did not take any steps to assess whether Bristow was a credible witness, nor could he recall whether he had taken any steps to corroborate Bristow's story with respect to Plaintiffs Defalco and Trantel—though such steps, if taken, would have been reflected in his incident reports.  (*Id.* at 170:8–20.)

## III.   Procedural History

### A.   District Court Proceedings

Plaintiffs filed their complaint on December 28, 2015, alleging claims under § 1983 for false arrest, malicious prosecution, due process violations, and First Amendment retaliation.[13]

---

[12]  The Court notes that it is undisputed that prior to Plaintiffs' arrests, no investigator spoke to any of the guards stationed at the security booth that Plaintiff Defalco drove past on December 8, 2012, nor sought footage from surveillance cameras at the Depot.  (Pls.' 56.1, Dkt. 59, at 11, ¶¶ 30–31.)

[13]  On December 14, 2017, Plaintiffs withdrew their First Amendment retaliation claims, along with dismissing Defendants Micyk, McGovern, Miller, Losito, and the MTA Police Department.  (Stipulation of Dismissal, Dkt. 47.)

(Complaint, Dkt. 1.)  The parties filed their completed summary judgment briefing on April 3, 2018.  (Dkt. 54.)  The same day, Defendants also filed a motion to strike the affidavit of Defalco's supervisor, Vinny Hernandez (Hernandez Aff., Dkt. 60-39), which Plaintiffs had submitted in support of their opposition to summary judgment.  (Defendants' Motion to Strike ("Defs.' Mot. to Strike"), Dkt. 65.)

On September 11, 2018, the Court granted Defendants' motion for summary judgment and denied their motion to strike as moot.  *Defalco v. MTA Bus Co.*, 333 F. Supp. 3d 191 (E.D.N.Y. 2018), *vacated and remanded*, 788 F. App'x 43 (2d Cir. 2019) (summary order).  The Court granted summary judgment to Bristow, finding insufficient evidence that he was acting under color of state law, a requisite element to a Section 1983 claim.  *Id.* at 198–202.  The Court granted summary judgment to Longaro on the false arrest claim, finding that he had probable cause to arrest Plaintiffs based on Bristow's eyewitness account and written statements, and that Plaintiffs had failed to offer evidence that Longaro knew any information at the time of the arrests that raised doubts as to Bristow's veracity.  *Id.* at 202–204.  The Court also granted summary judgment to Longaro on the malicious prosecution claim based on the existence of probable cause and the absence of intervening facts to dissipate probable cause before arraignment.  *Id.* at 205.  Finally, the Court held that Plaintiffs could not proceed with their due process claim because the allegations in the Complaint did not provide "fair notice" of the claim, and in any event, Plaintiffs' claim would fail as a matter of law.  *Id.* at 205–08.  On October 11, 2018, Plaintiffs filed a Notice of Appeal.  (Dkt. 69.)

### B.      Second Circuit Appeal

By summary order, the Second Circuit vacated the September 12, 2018 judgment for Defendants and remanded for further proceedings.[14]  *Defalco*, 788 F. App'x at 45.  The Circuit held that for purposes of Plaintiffs' Section 1983 claims, Bristow had acted under color of state law because he "undertook all relevant action as a means of carrying out the responsibilities of his official position."  *Id.* at 45.  The Circuit vacated summary judgment to Longaro "insofar as it rested on the question of probable cause," finding that:

> In arresting Plaintiffs, Detective Longaro relied on Bristow's eyewitness statement and written assertions.  Based upon an independent review of the record, and taking the facts in the light most favorable to the non-moving party, we conclude that a reasonable juror could determine that Longaro did not have probable cause to arrest Plaintiffs.  A reasonable juror could find that Bristow knowingly made misrepresentations to MTA police, and that Longaro was aware of apparent inaccuracies in Bristow's alleged eyewitness account of the theft.  A juror could reasonably find, for example, that Longaro, who claimed to have visited the fuel station and engine wash as part of his investigation, would have observed that a wall obstructed the view of the alleged crime scene from Bristow's purposed vantage point.  A juror could also reasonably find that Longaro had other reasons to doubt Bristow's credibility generally.  For example, one of Bristow's purported eyewitness sources for a related theft allegation claims that he spoke with an MTA police officer, prior to Plaintiffs' arrest and while Longaro was supervising the investigation, and denied ever observing or reporting the conduct that Bristow claims to have learned about from him.  Analyzing the facts in the light most favorable to Plaintiffs, a reasonable juror could conclude that Longaro was aware of circumstances that raised doubt as to Bristow's veracity, and therefore that Longaro lacked probable cause when he arrested Plaintiffs in reliance on Bristow's allegations.

*Id.* at 46. (internal quotation marks and citation omitted.)  Finally, the Circuit remanded on the issue of whether either Defendant is entitled to qualified immunity, leaving to the discretion of this Court whether further discovery was warranted on that issue.  *Id.*

---

[14] On appeal, Plaintiffs did not challenge the Court's ruling on their due process claims. *Defalco*, 788 F. App'x at 44.

### C.    Actions Following Remand

Following the Second Circuit's decision, the Honorable Robert M. Levy, Magistrate Judge, held a conference, during which the parties agreed that discovery was complete and that a settlement conference would not be useful.  (10/15/2019 Minute Entry.)  The parties jointly requested to supplement the prior summary judgment briefing (Dkt. 72), which the Court granted, permitting the parties to submit supplemental briefing on the remaining issues in this action, including qualified immunity and favorable termination (10/31/2019 Order Reopening Case).  The Court also agreed to consider Defendants' motion to strike Vinny Hernandez's affidavit, submitted as part of Plaintiffs' summary judgment opposition.  (*Id.*)

## LEGAL STANDARDS

### I.    Scope of the Court's Decision

As an initial matter, the Court is mindful that "[t]he mandate rule compels compliance on remand with the dictates of the superior court and forecloses relitigation of issues expressly or *impliedly* decided by the appellate court."  *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001) (emphasis in original) (internal quotation marks and citation omitted).  "Beyond deciding issues expressly or impliedly, '[a Circuit's] mandate may also, by its terms, further limit issues open for consideration on remand.'"  *Farnum Place, LLC v. Krys ex rel. Fairfield Sentry Ltd.* (*In re Fairfield Sentry Ltd.*), 690 F. App'x 761, 764 (2d Cir. 2017) (summary order) (quoting *Statek Corp. v. Dev. Specialists, Inc.* (*In re Coudert Bros. LLP*), 809 F.3d 94, 99 (2d Cir. 2015)); *see also Puricelli v. Republic of Argentina*, 797 F.3d 213, 218 (2d Cir. 2015) ("Where a mandate limits the issues open for consideration on remand, a district court ordinarily cannot consider additional issues.").  "To determine whether an issue remains open for reconsideration on remand, the trial court should look to both the specific dictates of the remand order as well as the broader spirit of the mandate."  *Ben Zvi*, 242 F.3d at 95 (internal quotation marks and citation omitted); *see also*

*MHANY Mgmt., Inc. v. County of Nassau*, No. 05-CV-2301 (ADS) (ARL), 2017 WL 4174787, at *3 (E.D.N.Y. Sept. 19, 2017) (same).

Here, the Second Circuit expressly concluded that Bristow "acted under color of state law" for purposes of Plaintiffs' Section 1983 claims and vacated summary judgment on that basis. *Defalco*, 788 F. App'x at 45. The Circuit also expressly found that "a reasonable juror could find from the present record that Longaro made the arrests in question without probable cause," and vacated the "grant of summary judgment to Longaro insofar as it rested on the question of probable cause." *Id.* at 45–46. Further, the Circuit expressly remanded the issue of qualified immunity "to the District Court with instructions to consider, in the first instance, whether either Defendant is entitled to a qualified immunity defense." *Id.* at 46.

Because the first issue for consideration in a qualified immunity analysis is "whether plaintiff has shown facts making out [a] violation of a constitutional right," *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013), on remand, the Court will address whether Longaro is entitled to summary judgment on the claims of false arrest and malicious prosecution on any basis other than the absence of probable cause, and then whether he is entitled to qualified immunity, *see Hurd v. Fredenburgh*, No. 19-3482, 2021 WL 96886, at *4 n.3 (2d Cir. Jan. 12, 2021) ("Although it has become the virtual default practice of federal courts considering a qualified immunity defense to assume the constitutional violation in the first question and resolve a case on the clearly established prong, 'it is often beneficial' to analyze both prongs of the qualified immunity analysis." (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009))). Likewise, the Court will address whether Bristow is entitled to summary judgment on the false arrest and malicious prosecution claims, and then whether he is entitled to qualified immunity.

## II.    Summary Judgment

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (noting that summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The initial "burden of establishing the absence of any genuine issue of material fact" rests with the moving party. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (per curiam). Once this burden is met, however, the burden shifts to the non-moving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial. *Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A mere "scintilla of evidence" is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (alteration in original) (internal quotation marks and citation omitted). In other words, "[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (internal quotation marks, citation, and emphasis omitted). In determining whether a genuine issue of fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). The Court also construes any disputed facts in the light most favorable to the non-moving party. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970).

### III.    Qualified Immunity

"Qualified immunity shields officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,'" *McCray v. Lee*, 963 F.3d 110, 119 (2d Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  This protection "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."  *Pearson*, 555 U.S. at 231 (internal quotation marks and citation omitted).  "The issues on qualified immunity are: (1) whether plaintiff has shown facts making out [a] violation of a constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful."  *Gonzalez*, 728 F.3d at 154 (citing *Taravella v. Town of Wolcott,* 599 F.3d 129, 133–34 (2d Cir.2010)); *accord Elder v. McCarthy*, 967 F.3d 113, 131 (2d Cir. 2020); *Vassiliou v. City of New York*, No. 18-CV-0779 (EK) (VMS), 2021 WL 76916, at *6 (E.D.N.Y. Jan. 7, 2021); *see also Swartz v. Insogna*, 704 F.3d 105, 109 (2d Cir. 2013) ("A police officer who has an objectively reasonable belief that his actions are lawful is entitled to qualified immunity." (citation omitted)).

"The operation of the 'clearly established' standard 'depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified.'"  *McCray*, 963 F.3d at 119 (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).  "[T]he Supreme Court has admonished that rights should not be defined at a high level of generality and instead must be 'particularized to the facts of the case.'"  *Hurd*, 2021 WL 96886, at *10 (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)).  However, "this does 'not' mean that the official enjoys immunity 'unless the very action in question has previously been held unlawful.'"  *McCray*, 963 F.3d at 119 (quoting *Anderson*, 483 U.S. at 639).  Thus, "the absence of a decision by [the Second Circuit] or

the Supreme Court directly addressing the right at issue will not preclude a finding that the law was clearly established so long as preexisting law clearly foreshadow[s] a particular ruling on the issue." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (internal quotation marks and citation omitted).

"There is no question that the rights . . . to be free from false arrest [and] malicious prosecution . . . [are] clearly established." *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995); *see Manganiello v. City of New York*, 612 F.3d 149, 164 (2d Cir. 2010) ("[F]reedom from malicious prosecution is a constitutional right that has long been clearly established." (citation omitted)); *Gilles v. Repicky*, 511 F.3d 239, 245 (2d Cir. 2007) ("The right to be free from arrest without probable cause has likewise long been established." (citation omitted)). Therefore, whether an official is entitled to qualified immunity for violating one of these clearly established rights turns on whether the official's conduct was objectively reasonable, which is a mixed question of law and fact. *See Manganiello*, 612 F.3d at 164–65 (citing *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007)).

After the factfinder has determined any disputed material facts, then the court decides "whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right[.]" *Manganiello*, 612 F.3d at 165 (quoting *Zellner*, 494 F.3d at 367). In other words, "[o]nce the jury has resolved any disputed facts that are material to the qualified immunity issue, the ultimate determination of whether the officer's conduct was objectively reasonable is to be made by the court." *Zellner*, 494 F.3d at 368 (citations omitted); *accord Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018).

20

## DISCUSSION

### I.    Motion to Strike

The Court first addresses Defendants' motion to strike the affidavit of Plaintiffs' witness Vinny Hernandez. "Under Rule 37(c)(1), when a party does not 'provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.'" *Zheng v. Perfect Team Corp.*, 739 F. App'x 658, 662 (2d Cir. 2018) (summary order) (quoting Fed. R. Civ. P. 37(c)(1)). Federal Rule of Civil Procedure 26(a)(1) requires parties to disclose, *inter alia*, "the name and, if known, the address and telephone number of each individual likely to have discoverable information." Fed. R. Civ. P. 26(a)(1). Additionally, if, after making such a disclosure, a "party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing," they are required to "supplement or correct [the] disclosure or response" in a timely manner. Fed. R. Civ. P. 26(e)(1). "The purpose of Rule 26(e) is to prevent the 'sandbagging' of a party with new evidence at trial or on a motion." *Roman v. RGS Fin., Inc.*, No. 17-CV-04917 (ADS) (AKT), 2019 WL 4247551, at *4 (E.D.N.Y. Sept. 6, 2019) (quoting *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004)).

"A party found to have violated its Rule 26 obligations is subject to sanctions under Rule 37." *Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 68 (E.D.N.Y. 2012). The party moving to preclude or strike for failure to produce discovery must demonstrate:

> (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had "a culpable state of mind"; and (3) that the missing evidence is "relevant" to the party's claim or defense such that a reasonable trier of fact could find it would support that claim or defense.

*Markey v. Lapolla Indus., Inc.*, No. 12-CV-4622 (JS) (AKT), 2015 WL 5027522, at \*16 (E.D.N.Y. Aug. 25, 2015) (quoting *In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 125 (S.D.N.Y. 2007)), *report and recommendation adopted*, 2016 WL 324968 (E.D.N.Y. Jan. 26, 2016).  A court may strike evidence under Rule 37 "for untimely, incomplete, or misleading responses during discovery."  *New World Sols., Inc. v. NameMedia Inc.,* 150 F. Supp. 3d 287, 304 (S.D.N.Y. 2015) (citation omitted).  However, "[a] failure to disclose is substantially justified if reasonable minds could differ as to whether the party was required to comply with the disclosure request, or if there exists a genuine dispute concerning compliance."  *Codename Enters., Inc. v. Fremantlemedia N. Am., Inc.*, No. 16-CV-1267 (AT) (SN), 2018 WL 3407709, at \*3 (S.D.N.Y. Jan. 12, 2018) (internal quotation marks and citation omitted); *see also Ritchie Risk–Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 159 (S.D.N.Y. 2012) (same).

District courts have "wide discretion to impose sanctions, including severe sanctions, under Federal Rule of Civil Procedure 37."  *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 294 (2d Cir. 2006); *see also Lujan*, 284 F.R.D. at 68.  Preclusion is a "harsh remedy" that "should only be imposed in rare situations."  *Izzo v. ING Life Ins. & Annuity Co.,* 235 F.R.D. 177, 186 (E.D.N.Y. 2005).  The Second Circuit has identified the following factors as appropriate for consideration:

> (1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.

*Design Strategy, Inc.*, 469 F.3d at 296 (alteration in original) (quoting *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006)); *see also Roman*, 2019 WL 4247551, at \*5.

Defendants argue that Plaintiffs violated Rule 26 by failing to "facilitate [Vinny] Hernandez' deposition when [Plaintiffs'] counsel was in contact with him at the very time

Defendants' [*sic*] sought his deposition." (Defs.' Mot. to Strike, Dkt. 65, at 3.) Defendants urge the Court to strike Hernandez's affidavit under Rule 37(c) because "Plaintiffs' failure . . . has substantially prejudiced the Defendants" and "it would clearly be inequitable for Plaintiffs to be able to use [Hernandez's] testimony in opposition to Defendants' motion for summary judgment or at trial." (*Id.*) Plaintiffs counter that they have no obligation to "facilitate the deposition of a non-party witness," and therefore did not violate Rule 26. (Plaintiffs' Response to Motion to Strike ("Pls.' Resp. to Mot. to Strike"), Dkt. 66, at 3 (internal quotation marks omitted).) Further, Plaintiffs contend that even if their conduct constituted a Rule 26 violation, Rule 37 sanctions are unwarranted because Defendants were not prejudiced. (*See id.* at 3–5.) The Court agrees with Plaintiffs and denies Defendants' motion to strike.

Defendants invoke Rule 37 yet fail to state a Rule 26 violation. Rule 26 mandates the disclosure of information, not the facilitation of non-party depositions. *See* Fed. R. Civ. P. 26(a), (e). Likewise, Rule 37(c)(1) provides for sanctions "[i]f a party fails to *provide information* or *identify a witness* as required by Rule 26(a) or (e)." Fed. R. Civ. P. 37(c)(1) (emphasis added). As Plaintiffs note, and Defendants concede, Hernandez was included in the initial Rule 26(a) disclosures from May 2016. (*See* Defs.' Mot. to Strike, Dkt. 65, at 1; Pls.' Resp. to Mot. to Strike, Dkt. 66, at 2; Plaintiffs' Rule 26(a) Disclosures, Dkt. 66-9, at 3.) Moreover, in May 2017, when Defendants' counsel notified Plaintiffs' counsel that the home address provided for Hernandez was outdated, Plaintiffs' counsel contacted Hernandez and provided a new address. (*See* Defs.' Mot. to Strike, Dkt. 65, at 2; Pls.' Resp. to Mot. to Strike, Dkt. 66, at 2; Declaration of Patrick J. Walsh, Dkt. 66-14.)[15]

---

[15] The Court notes that Defendants were also able to independently procure the same address by virtue of Hernandez being a former MTA employee. (*See* Defs.' Mot. to Strike, Dkt. 65, at 2.) Additionally, with respect to Defendants' claim that Plaintiffs improperly refused to

Defendants further contend that "Plaintiffs procured an affidavit from a witness which was created by [Plaintiffs'] counsel at the same time that witness apparently refused service of a subpoena from Defendants." (Defs.' Mot. to Strike, Dkt. 65, at 2.) However, without more, such a claim does not equate either to Plaintiffs' "untimely production of documents and information required to be produced," *In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. at 125, or to Plaintiffs' "incomplete, or misleading responses during discovery." *New World Sols., Inc.*, 150 F. Supp. 3d at 304; *see also Official Comm. of Unsecured Creditors of Exeter Holdings, Ltd. v. Haltman*, No. 13-CV-5475 (JS) (AKT), 2015 WL 9701024, at *4 (E.D.N.Y. Aug. 26, 2015) ("The record in this case simply does not support the conclusion that Plaintiff has done anything other than make its disclosures based on information the Plaintiff reasonably ha[d] available to it at the [] time."), *report and recommendation adopted sub nom. Official Comm. of Unsecured Creditors v. Haltman*, 2016 WL 183318, (E.D.N.Y. Jan. 13, 2016).

Moreover, even if Plaintiffs had violated Rule 26, the Court is not persuaded that striking Hernandez's Affidavit would be warranted under Rule 37. *See, e.g.*, *Olutosin v. Gunsett*, No. 14-CV-685 (NSR), 2019 WL 5616889, at *4 (S.D.N.Y. Oct. 31, 2019) ("Although Rule 37(c)(1) is 'written in mandatory terms,' the imposition of sanctions for abuse of discovery is 'a matter within the discretion of the trial court.'" (quoting *Hein v. Cuprum, S.A., De C.V.*, 53 F. App'x 134, 136 (2d Cir. 2002) (summary order)); *Lujan*, 284 F.R.D. at 68 (same). Notwithstanding the fact that "reasonable minds could 'differ'" as to the existence of "a genuine dispute concerning compliance," *Codename Enters., Inc.*, 2018 WL 3407709, at *3, "the prejudice suffered by the

---

identify Hernandez as an affiant during discovery (*see id* at 3), the Honorable Robert M. Levy denied Defendants' motion to compel the identification of such affiants with leave to renew. (*See* Sept. 12, 2017 Order.) A review of the docket indicates that Defendants did not seek such leave.

opposing party as a result of having to prepare to meet the new testimony" militates against preclusion here, *Design Strategy, Inc.*, 469 F.3d at 296; *see also Aboeid v. Saudi Arabian Airlines Corp.*, No. 10-CV-2518 (SJ) (VVP), 2011 WL 5117733, at *2 (E.D.N.Y. Sept. 6, 2011) ("Failure to comply with the mandate of [Rule 26] is harmless when there is no prejudice to the party entitled to the disclosure." (quoting *Am. Stock Exchange, LLC v. Mopex, Inc.*, 215 F.R.D. 87, 93 (S.D.N.Y. 2002))).

Defendants are not prejudiced, as Hernandez's affidavit should not come as a surprise. Following the parties' initial disclosures, Defendants were aware in May 2016 that Hernandez was likely to have discoverable information. (*See* Defs.' Mot. to Strike, Dkt. 65, at 1; Pls.' Resp. to Mot. to Strike, Dkt. 66, at 2; Plaintiffs' Rule 26(a) Disclosures, Dkt. 66-9, at 3.) Additionally, in August 2016, Plaintiffs produced a 2013 affidavit from Hernandez concerning the same subject matter as part of discovery. (*See* Plaintiffs' Responses and Objections to Defendants' First Set of Document Demands, Dkt. 66-17, at 5 (referring to Bates No. 0028); May 2, 2013 Vinicio Hernandez Statement, Dkt. 66-18 (Bates P-0028).) Accordingly, Defendant's motion to strike is denied.

## II.    Defendant Longaro

The Circuit vacated this Court's "grant of summary judgment to Longaro *insofar as it rested on the question of probable cause*." *Defalco*, 788 F. App'x at 46 (emphasis added). Before proceeding to the issue of qualified immunity, which is the focus of the parties' briefing with respect to Longaro, the Court addresses whether Longaro is entitled to summary judgment on Plaintiffs' false arrest and malicious prosecution claims *beyond the question of probable cause*, and concludes that he is not.

A.      **False Arrest**

With respect to false arrest, Longaro's sole argument in support of summary judgment is that he had probable cause, which is a complete defense to a false arrest claim.  (*See* Defendants' Summary Judgment Memorandum ("Defs.' Br."), Dkt. 55, at 7–10.)  This Court rested its prior decision to grant Longaro summary judgment on its determination that Longaro "had probable cause to arrest Plaintiffs based on Bristow's eyewitness and written statements."  *Defalco*, 333 F. Supp. 3d at 204.  Thus, the Circuit's vacatur makes clear that Longaro is not entitled to summary judgment on Plaintiffs' false arrest claim against him.

B.      **Malicious Prosecution**

With respect to malicious prosecution, Longaro previously argued that probable cause to arrest was a complete defense to this claim, but also that there was no evidence that the criminal charges were terminated in Plaintiffs' favor, and that there was no evidence of malice (Defs.' Br., Dkt. 55, at 10–13), both elements of a malicious prosecution claim.  *See Swartz*, 704 F.3d at 111–12 (explaining that the elements of a Section 1983 malicious prosecution claim are "(1) commencement of a criminal proceeding, (2) favorable termination of the proceeding, (3) lack of probable cause, [] (4) institution of the proceedings with actual malice," and (5) "post-arraignment seizure" (citing, *inter alia*, *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003))).  This Court's prior decision did not address Longaro's arguments regarding favorable termination and malice.  *See Defalco*, 333 F. Supp. 3d at 205.  In light of this, and because the Circuit's vacatur was limited to the issue of probable cause, the Court now addresses these remaining arguments.

The Court is not persuaded by Defendants' argument that Plaintiffs' malicious prosecution claim must be dismissed "[a]s a matter of law" on the element of favorable termination.  (Defs.' Br., Dkt. 55, at 11.)  In *Lanning v. City of Glens Falls*, the Second Circuit clarified "that federal law defines the elements of a § 1983 malicious prosecution claim," and that "decisions requiring

affirmative indications of innocence to establish 'favorable termination' [] continue to govern § 1983 malicious prosecution claims."  908 F.3d 19, 25 (2d Cir. 2018).[16]  Following *Lanning*, this Court and others in this Circuit have found that speedy trial dismissals *can* constitute a favorable termination of criminal proceedings.  *See, e.g.*, *Blount v. City of New York*, No. 15-CV-5599 (PKC) (JO), 2019 WL 1050994, at *5 (E.D.N.Y. Mar. 5, 2019) (concluding that "[w]hile *Lanning* may raise the bar for establishing favorable termination under § 1983 in certain cases, the dismissal of a prosecution on speedy trial grounds" can "clear[] that bar"); *see also, e.g.*, *Minus v. City of New York*, No. 17-CV-4827 (VSB), 2020 WL 5646149, at *5 (S.D.N.Y. Sept. 22, 2020) (noting that this issue is unsettled law and collecting cases post-*Lanning* where district courts have found that "a speedy trial dismissal constitutes a favorable termination under federal law in a Section 1983 malicious prosecution case").  It is not completely clear whether Plaintiffs' criminal prosecution terminated on the basis of a speedy trial violation.  (*See* Declaration of Jake LaSala,[17] Dkt. 60-38, ¶ 3; Trantel Aff., Dkt. 60-37, ¶ 16[18].)  However, the Court finds that Plaintiffs have introduced

---

[16]  The Court notes that *Lanning* was decided on November 7, 2018, after the parties completed their initial briefing on summary judgment.  The Court permitted the parties to address the issue of favorable termination in their additional summary judgment briefing.  (*See* 10/31/2019 Order.)  Defendants did not address favorable termination or *Lanning*, nor did they respond to Plaintiffs' arguments on this issue, in their supplemental briefing.  (*See generally* Memorandum of Law in Support of Defendants' Renewed Motion for Summary Judgment ("Defs.' Supp. Br."), Dkt. 78; Defendants' Reply Memorandum of Law in Further Support of Defendants' Supplemental Motion for Summary Judgment ("Defs.' Supp. Reply"), Dkt. 82.)

[17]  LaSala represented Plaintiff Defalco in the criminal case and states that "[a]ll charges against Mr. Defalco were dismissed in October 2014 under CPL 30.30 on speedy trial grounds." (Dkt. 60-38 ¶ 3.)

[18]  Plaintiff Trantel stated in his affidavit that "both [Defalco's] case and my case were dismissed at the same time and for the same reasons—the DA had not been able to get an indictment and ran out of time."  (Trantel Aff., Dkt. 60-37, ¶ 16.)

sufficient evidence that would allow a reasonable juror to conclude that it did, and thus, that Plaintiffs' underlying criminal case terminated in their favor.

Defendants also argue that Plaintiffs cannot establish that Longaro acted with malice because they have failed to elicit evidence that Longaro acted with "conscious falsity" when he signed the criminal court complaints against Plaintiffs Defalco and Trantel. (Defs.' Br., Dkt. 55, at 13.)  Plaintiffs are correct that "[m]alice may be shown by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff." *Manganiello*, 612 F.3d at 163 (quoting *Pinsky v. Duncan*, 79 F.3d 306, 313 (2d Cir. 1996)).  However, "[a] lack of probable cause generally creates an inference of malice." *Id.* (quoting *Boyd v. City of New York*, 336 F.3d 72, 78 (2d Cir. 2003); *see Franks v. City of New York*, No. 13-CV-5358 (ARR), 2015 WL 3533721, at *8 (E.D.N.Y. June 4, 2015) ("[T]he caselaw is clear that a jury can infer malice from the lack of probable cause[.]")  "In most cases, the lack of probable cause—while not dispositive—'tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause.'" *Weiner v. McKeefery*, 90 F. Supp. 3d 17, 37 (E.D.N.Y. 2015) (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996)).  Once a court finds "an issue of material fact as to probable cause, the element of malice also becomes an issue of material fact." *Boyd*, 336 F.3d at 78.

Here, Defendant Longaro's argument that he had probable cause to sign the criminal complaints against Plaintiffs rides on the coattails of his argument that he had probable cause to arrest them. (Defs.' Br., Dkt. 55, at 11–13.)  The Circuit concluded that a reasonable juror could determine that Longaro lacked probable cause to arrest Plaintiffs based on "Bristow's eyewitness statement and written assertions." *Defalco*, 788 F. App'x at 45.  However, "[t]he probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest

cases," *Stansbury v. Wertman*, 721 F.3d 84, 95 (2d Cir. 2013), and has "been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty," *id.* (quoting *Boyd*, 336 F.3d at 76).

Defendant Longaro has not proffered any evidence to support a separate probable cause finding with respect to the malicious prosecution claim. Nor is it likely that Longaro could put forth such evidence, given that a reasonable juror could conclude that the criminal complaints he signed in support of the offenses charged were based solely on information from Bristow (*see* Longaro Dep., Dkt. 60-44, at 207:22–209:25; Trantel Felony Compl., Dkt. 57-19; Defalco Criminal Records, Dkt. 57-34, at ECF 3–5)—whose veracity, a reasonable juror could also conclude, Longaro had reason to doubt. *See Defalco*, 788 F. App'x at 46;[19] *see also Wong v. Yoo*, 649 F. Supp. 2d 34, 66 (E.D.N.Y. 2009) ("If a plaintiff can show that there is a material issue of fact as to the existence of probable cause to make an arrest, then a material issue of fact exists as to whether there was probable cause to prosecute." (citing *Posr v. Court Officer Shield # 207*, 180 F.3d 409, 417 (2d Cir.1999))). Therefore, the Court finds that a reasonable juror could conclude that Longaro lacked probable cause to sign the criminal complaints against Plaintiffs and,

---

[19] Even assuming that Defendant Longaro had probable cause to arrest, which the Circuit held a reasonable juror may conclude he did not, "there is a genuine issue of fact in the current record regarding whether probable cause continued to exist after the arrest given the information that [Longaro] allegedly had in his possession regarding [Plaintiffs'] innocence," namely, Defalco's statement that his supervisor Vinny Hernandez was in the truck with him when Defalco left the Depot on December 8, 2012 (*see* Defs.' 56.1, Dkt 56, ¶ 29; Dkt. 60-21, at ECF 4). *See Weiner*, 90 F. Supp. 3d at 33–38 (granting summary judgment on false arrest, but denying summary judgment on malicious prosecution because of open questions about whether the arresting officer reviewed an exculpatory recording before executing the misdemeanor information); *Bleiwas v. City of New York*, No. 15-CV-10046 (ER), 2019 WL 4747984, at *9 (S.D.N.Y. Sept. 30, 2019) ("The principal dispute, and the one the Court finds is sufficiently material to send to a jury, regards what [the arresting officer] did . . . between [Plaintiffs'] arrest and when [the arresting officer] signed the criminal complaint," namely whether it was reasonable for the arresting officer to cease his investigation into plaintiff's explanation of his innocence.).

correspondingly, that he did so with malice or "a reckless disregard of the rights of [] plaintiff[s]." *See Manganiello*, 612 F.3d at 163; *Boyd*, 336 F.3d at 78.

The Court therefore denies Longaro summary judgment on Plaintiffs' malicious prosecution claim against him.

### C.    Qualified Immunity

Having found that a reasonable juror could conclude that Defendant Longaro violated Plaintiffs' clearly established rights to be free from false arrest and malicious prosecution, *see Lennon*, 66 F.3d at 423; *Manganiello*, 612 F.3d at 164; *Gilles*, 511 F.3d at 245, the Court focuses its attention—as do the parties in their briefs—on the question of "whether it was objectively reasonable for [Longaro] to believe that his conduct did not violate a clearly established right, *i.e.,* whether officers of reasonable competence could disagree as to the lawfulness of such conduct," *see Manganiello*, 612 F.3d at 165 (quoting *Zellner*, 494 F.3d at 367).

Defendant Longaro asserts that he is entitled to qualified immunity because, "[b]ased on the indisputable material facts[,] . . . it is plain that an objectively reasonable police officer faced with the [same] evidence available to [him] could have concluded that [Plaintiffs] were involved in a scheme to steal batteries from the JFK depot." (Defs.' Supp. Br., Dkt. 78, at 13.)  In particular, Longaro argues that he reasonably relied on the "mountain of evidence" before him, including the "numerous observations of thefts" at the Depot from September 2012 through the spring 2013, and McGovern and Micyk's case files detailing the previous investigation.  (*Id.* at 13–14.) Additionally, the "confessions and pleas" to battery theft by Williams and Boodhai, and later Pastor, "along with the objective evidence of theft matching Bristow's accounts" served as confirmation of "Bristow's reliability as a witness." (*Id.* at 14.)

In opposition, Plaintiffs argue that, among other things, the Circuit's findings demonstrate that a reasonable trier of fact could conclude that Longaro's conduct in arresting and prosecuting

Plaintiffs was unreasonable, thereby precluding summary judgment on qualified immunity. (Plaintiffs' Supplemental Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pls.' Supp. Opp."), Dkt. 79, at 21.)  Further, Plaintiffs challenge the notion that Boodhai's and Pastor's arrests bolstered Bristow's credibility, given that those arrests post-dated Plaintiffs' arrests, and argue, with respect to Williams' arrest, that "any reasonable officer would have had to weigh this single instance of 'reliability' against the substantial evidence Longaro had acquired by March 13 (the day of Defalco's arrest) 'that raise[d] doubts as to [Bristow's] veracity.'"  (*Id.* at 22–23 (quoting *Defalco*, 788 F. App'x at 46).)

An officer is entitled to qualified immunity to a false arrest claim if there was "arguable probable cause" to arrest, meaning that given the information in the officer's possession at the time of the arrest, "(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met."  *Garcia*, 779 F.3d at 92 (2d Cir. 2015) (citation omitted).  Arguable probable cause is not "almost" probable cause; thus, "[i]f officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer."  *Gonzalez*, 728 F.3d at 157 (citation omitted).  "Although the tests for probable cause and arguable probable cause are . . . not congruent, the concept of probable cause is the same in both inquiries."  *Zellner*, 494 F.3d at 370 (citation omitted).

"In general, probable cause to arrest exists when the [arresting] officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  *Gonzalez*, 728 F.3d at 155 (emphasis omitted) (quoting *Weyant v. Okst*, 101

F.3d 845, 852 (2d Cir. 1996)).  "The inquiry is limited to 'whether the facts known by the arresting officer *at the time of the arrest* objectively provided probable cause to arrest.'"  *Id.* (emphasis added) (quoting *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006)).  "[P]robable cause exists if a law enforcement officer 'received [ ] information from some person, normally the putative victim or eyewitness, *unless the circumstances raise doubt as to the person's veracity*.  The reliability or veracity of the informant and the basis for the informant's knowledge are two important factors.'"  *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) (emphasis added) (quoting *Panetta v. Crowley,* 460 F.3d 388, 395 (2d Cir.2006)).

Accordingly, where circumstances known to the arresting officer at the time of arrest raise doubt as to the complaining witness's veracity, thereby undermining a finding of probable cause, courts have declined to find arguable probable cause at the summary judgment stage.  *See Selvaggio v. Patterson*, 93 F. Supp. 3d 54, 72–73 (E.D.N.Y. 2015) (declining to find arguable probable cause at the summary judgment stage because, at the time of arrest, the officers were aware of information that raised doubts about the complainant's allegations and "a reasonable jury could find, under the circumstances, that no reasonable officer would have concluded that there was probable cause to believe Plaintiff had unlawfully imprisoned [the complainant]"); *Ward v. City of New York*, No. 08-CV-7380 (RJH), 2010 WL 3629536, at *2, *2 n.4 (S.D.N.Y. Sept. 17, 2010) (finding that qualified immunity was not established by the factual record, which "permits the conclusion that it was not objectively reasonable for the officers to arrest plaintiff based on [the complainant]'s comments alone, without any corroborating evidence or further investigation" because the complainant's "equivocation and [other] statements . . . raised significant questions about the truth of her story"); *cf. Williams v. City of New York*, 683 F. App'x 57, 59 (2d Cir. 2017) (summary order) (affirming finding of arguable probable cause where "the circumstances known

to the arresting officers in each of the three arrests did not 'raise doubts as to [the complainant's] veracity' such that the officers were unjustified in relying on [the complainant's] accusations" (quoting *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995))).

Here, the Circuit has already found that "a reasonable juror could conclude that *Longaro was aware of circumstances that raised doubt as to Bristow's veracity*, and therefore that Longaro lacked probable cause when he arrested Plaintiffs in reliance on Bristow's allegations." *Defalco*, 788 F. App'x at 46 (emphasis added) (internal quotation marks and citation omitted). This finding by the Circuit goes to the heart of the arguable probable cause inquiry and dictates that there are material facts in dispute on this issue—namely, whether and to what extent, at the time of arrest, Longaro was aware of apparent inaccuracies in Bristow's alleged eyewitness account after observing the crime scene from Bristow's purported vantage point, and whether Longaro had reason to doubt Bristow's credibility based on a possible conversation with Sukhee in which Sukhee denied ever observing or reporting battery thefts to Bristow. *See Defalco*, 788 F. App'x at 46; *supra* Disputed Facts.

The Court is also not convinced by the argument that Longaro reasonably relied on the "mountain of evidence" before him and on the "confessions and pleas" of Williams, Boodhai, and Pastor. (Defs.' Supp. Br., Dkt. 78, at 13–14.) The so-called mountain of evidence included several alleged reports of theft that were attributed to Sukhee (*see* Dec. 12, 2012 McGovern Mem., Dkt. 60-8, at ECF 1, 5; Dkt. 60-13, at ECF 15, 16; Dkt. 60-17, at ECF 4, 5), which a reasonable juror may conclude Longaro had reason to doubt at the time of Plaintiffs' arrests. *See Defalco*, 788 F. App'x at 46. Further, Plaintiffs aver that "[n]one of Longaro, Micyk, or McGovern's investigative efforts . . . yielded any evidence whatsoever *implicating Plaintiffs* in battery theft at the depot." (Pls.' 56.1, Dkt. 59, at 14, ¶ 47 (emphasis added).) Defendants respond that "[t]he investigative

efforts yielded an eyewitness to the December 8, 2012, theft (Bristow), whose report of other thefts at the depot was later substantiated." (Defs.' Resp. 56.1, Dkt. 64, ¶ 47.) In other words, all roads lead back to Bristow, which is consistent with Longaro's deposition testimony that he arrested and signed the criminal complaints against Plaintiffs based on Bristow's statements and nothing else. (*See* Longaro Dep., Dkt. 60-44, at 169:12–25, 190:2–12, 207:22–209:5.) Given that a reasonable juror could conclude that Longaro was aware of reasons to doubt the veracity of Bristow's statements, Defendant's so-called "mountain" may well turn out to be an evidentiary molehill.

Further, "[i]n deciding whether an officer's conduct [i]s objectively reasonable" for purposes of qualified immunity, courts "look to the information possessed by the officer *at the time of the arrest*." *Garcia*, 779 F.3d at 92 (emphasis added) (internal quotation marks and citation omitted). Longaro did not know about Boodhai's alleged thefts at the time he arrested Defalco because Defalco reportedly provided Longaro with this information during his post-arrest interview. (*See* Defs.' Supp. 56.1, Dkt. 77, ¶ 85.) Moreover, the subsequent confirmation that Boodhai was selling bus batteries and other materials to a scrap metal purchaser (*id.* ¶ 87) goes to Plaintiff *Defalco's* credibility, not Bristow's, and therefore has no bearing on Plaintiff Trantel's arrest the next day. Notably, Boodhai was not arrested, nor did he confess to any crime, until April 15, 2013—nearly a month after Plaintiffs' arrests. (*Id.*) Pastor's arrest on March 22, 2013 also post-dates Plaintiffs' arrests. (*Id.* ¶ 90.) Because these other arrests occurred after Plaintiffs' arrests, they are of little consequence to the qualified immunity analysis. By contrast, Williams' arrest, based in part on information from Bristow, and Williams' admission to stealing batteries from the Depot, occurred several days before Plaintiffs' arrests. (*See* Defs.' 56.1, Dkt 56, ¶ 27; Defs.' Supp. 56.1, Dkt. 77, ¶ 84.) Even assuming that Bristow's statements regarding Williams were corroborated prior to Plaintiffs' arrests, thereby bolstering Bristow's credibility generally,

this does not definitively resolve the factual dispute as to Longaro's awareness of other circumstances that raised doubt as to Bristow's veracity vis-à-vis Plaintiffs and the alleged events on December 8, 2012.

In sum, because there are genuinely disputed facts that are material to the issue of arguable probable cause—namely, whether and to what extent Longaro was aware of circumstances that raised doubt as to Bristow's credibility and the veracity of his eyewitness account—the Court cannot, at this time, determine "whether it was objectively reasonable for [Longaro] to believe that his conduct did not violate a clearly established right." *See Manganiello*, 612 F.3d at 165 (quoting *Zellner*, 494 F.3d at 367). Granting summary judgment on qualified immunity grounds to Defendant Longaro therefore would not be appropriate. *See McKelvie v. Cooper*, 190 F.3d 58, 63 (2d Cir. 1999) (concluding that where "there are facts in dispute that are material to a determination of reasonableness, summary judgment on qualified immunity grounds is not appropriate"); *see Case v. City of New York*, 408 F. Supp. 3d 313, 322 (S.D.N.Y. 2019) (citing *McKelvie* and denying summary judgment on qualified immunity grounds because "the facts underlying arguable probable cause are contested, and because such factual disputes prevent evaluation of the reasonableness of the [arresting] officer's actions"); *Garcia v. County of Westchester*, No. 11-CV-7258 (KMK), 2017 WL 6375791, at *18–19 (S.D.N.Y. Dec. 12, 2017) (same); *Weiner*, 90 F. Supp. 3d at 38 (denying summary judgment on qualified immunity grounds where "disputed issues of fact preclude[d] a determination, at the summary judgment stage, as to whether it was objectively reasonable . . . for [the officer] to believe probable cause existed to commence and continue plaintiff's prosecution"). Once a jury has resolved whether and to what extent Longaro was aware of circumstances that raised doubt as to Bristow's veracity—a factual dispute that is central to the arguable probable cause inquiry—then this Court may make the "ultimate determination of

whether [Longaro]'s conduct was objectively reasonable." *See Zellner*, 494 F.3d at 368. Therefore, Longaro is denied qualified immunity at this time.

**III.    Defendant Bristow**

With respect to Defendant Bristow, the Circuit vacated summary judgment in his favor after concluding that Bristow undertook all relevant action under color of state law. *Defalco*, 788 F. App'x at 45. Now, the Court considers whether Bristow is entitled to summary judgment on Plaintiffs' false arrest and malicious prosecution claims, and, if not, on qualified immunity grounds. For the reasons explained below, the Court concludes that he is not.

**A.    False Arrest**

To state a false arrest claim under New York law, giving rise to liability under Section 1983, plaintiff must show that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)); *see Pukhovich v. City of New York*, No. 16-CV-1474 (KAM) (PK), 2018 WL 4688943, at *9 (E.D.N.Y. Sept. 27, 2018) (quoting *Weyant*, 101 F.3d at 853).

While "[a] third party may not be liable for false arrest if he merely reports a suspected crime, and the police act independently to investigate that crime . . . , if the evidence indicates that the third party *intended* or *instigated* the plaintiff's arrest, liability may be extended." *Charles v. County of Nassau*, 116 F. Supp. 3d 107, 125 (E.D.N.Y. 2015) (emphasis in original) (citing *King v. Crossland Sav. Bank,* 111 F.3d 251, 257 (2d Cir.1997). "A defendant 'instigates' an arrest when he takes an active role in the arrest of the plaintiff[,] . . . includ[ing] the provision of false information leading to an arrest, where the defendant[] lacked reasonable cause for their belief in

the plaintiff's culpability." *TADCO Constr. Corp. v. Dormitory Auth. of State of N.Y.*, 700 F. Supp. 2d 253, 268–269 (E.D.N.Y. 2010) (internal quotation marks and citation omitted).

In other words, "[a] complainant can be held liable for false arrest if the complainant 'intentionally provided false information' to instigate an arrest by law-enforcement officials, or had no reasonable basis for the report." *Pukhovich*, 2018 WL 4688943, at *9 (quoting *Biswas v. City of New York*, 973 F. Supp. 2d 504, 519 (S.D.N.Y. 2013)); *see id.* at *10–11 (denying summary judgment on false arrest claim because, *inter alia*, there was a genuine dispute over whether defendant traffic agent intentionally conveyed a false account of an ongoing assault and falsely identified plaintiff as the perpetrator to the arresting officer); *Wright v. Musanti*, No. 14-CV-8976 (KBF), 2017 WL 253486, at *10–11 (S.D.N.Y. Jan. 20, 2017) (entering judgment for false arrest against private individual defendant whom the Court found "intentionally provided false information to the police in order to bring about [plaintiff's] arrest" and because "the sole proven bases for the arrest are the combination of defendant's fallacious witness statement and defendant's decision to press charges") (internal quotation marks and citations omitted), *aff'd*, 887 F.3d 577 (2d Cir. 2018); *Levitz v. McQuade*, No. 15-CV-976 (AMD) (VMS), 2017 WL 10110881, at *4 (E.D.N.Y. Aug. 21, 2017) (denying summary judgment on state law false arrest claim where the parties provided conflicting accounts and, based on the record, the court could not determine whether the civilian defendant's statements to the police were false); *Rateau v. City of New York*, No. 06-CV-4751 (KAM) (CLP), 2009 WL 3148765, at *6–7 (E.D.N.Y. Sept. 29, 2009) (denying summary judgment on false arrest claim where the parties provided conflicting accounts, and a jury could reasonably believe plaintiff's account and infer that City employee defendant made false reports to the police); *see also Paul v. Bank of Am. Corp.*, No. 09-CV-1932 (ENV) (JMA), 2011 WL 684083, at *7 (E.D.N.Y. Feb. 16, 2011) (holding that plaintiff adequately pled a state

law false arrest claim by alleging, *inter alia*, that defendants instigated her arrest when they contacted the police and falsely reported fraud, noting that plaintiff "was arrested solely based on the representations of defendants' fraud investigator").

Here, the parties' dispute centers on the first element of false arrest—Bristow's intent to confine Plaintiffs. Bristow argues that the record is devoid of evidence that he "instigated" Plaintiffs' arrests because he "did nothing more than provide information to his employer, primarily, and to a lesser degree, law enforcement officers," and Longaro "independently decided" to arrest Plaintiffs. (Defs.' Supp. Br., Dkt. 78, at 18–19.) Plaintiffs counter that there is, among other things, a genuine dispute regarding Bristow's intent to confine because the Second Circuit already ruled that "[a] reasonable juror could find that Bristow knowingly made misrepresentations to MTA police," which Longaro "relied on" when arresting Plaintiffs, and that photographs recently submitted by Defendants do not resolve, but rather "highlight," the parties' dispute over Bristow's vantage point and the credibility of his observations on December 8, 2012. (Pls.' Supp. Opp., Dkt. 79, at 3–8.)

The Court concludes that there is a genuine dispute over whether Bristow knowingly provided false information to the MTAPD, or at the very least, had no reasonable basis for the reports he made. While the Circuit did not expressly reach this issue in the context of the false arrest claim against Bristow, as Plaintiffs correctly note, it nonetheless determined that "[a] reasonable juror could find that Bristow knowingly made misrepresentations to MTA police." *Defalco*, 788 F. App'x at 46. Moreover, consistent with the Circuit's finding that "[a] juror could reasonably find . . . that Longaro, who claimed to have visited the fuel station and engine wash [area] as part of his investigation, *would have observed that a wall obstructed the view of the alleged crime scene from Bristow's purposed vantage point*," *Defalco*, 788 F. App'x at 46

(emphasis added), the Court concludes that there is a genuine dispute as to Bristow's vantage point and sightline on December 8, 2012.  (*See supra* Disputed Facts.)  Evaluating the record in the light most favorable to Plaintiffs, the Court concludes that a reasonable juror could find, consistent with his December 2012 reports to Blackman and the MTAPD (*see* Dec. 8, 2012 Bristow Report, Dkt. 60-28; Defs.' 56.1, Dkt. 56, ¶¶ 21–22), that Bristow was looking through "the glass door" in the fuel station office, and that from that vantagepoint, a wall would have obstructed his view of what was happening in the engine wash area.[20]

Relatedly, the Court concludes that there is a genuine dispute over what Bristow saw on December 8, 2012 (*see supra* Disputed Facts), and that a reasonable juror could believe Plaintiffs' and Hernandez's version of events—that Hernandez left the Depot with Plaintiff Defalco and that there were no batteries in the back of the truck at that time.  (Pls.' 56.1, Dkt. 59, at 9, ¶ 17; Dkt. 60-39, ¶¶ 12–14.)  Additionally, a reasonable juror could conclude that Bristow did not have a reasonable basis for unequivocally reporting to MTAPD that Defalco was not authorized to take batteries from the Depot (*see* Defs.' 56.1, Dkt. 56, ¶ 22), given that on December 8, 2012, Bristow was not Defalco's supervisor, had not spoken to any of Defalco's supervisors, had not reviewed Defalco's assignment sheet, and had no knowledge of what Defalco was assigned to do that day.

---

[20]  The Court notes Plaintiffs' objection to Defendants' inclusion of new photograph evidence (*see* Dkt. 76) at this stage in the litigation.  (*See* Pls.' Supp. Opp., Dkt. 79, at 6–8.) However, the Circuit left the issue of further discovery to the discretion of this Court.  *Defalco*, 788 F. App'x at 46.  While the Court did not solicit additional discovery from the parties in connection with the supplemental briefing, these new photographs do not alter the Court's conclusion that the questions of Bristow's vantage point and sightline on December 8, 2012, and whether he knowingly provided false information to investigative authorities, are best left to a jury. *Cf. Landers v. City of New York*, No. 16-CV-5176 (PKC) (CLP), 2019 WL 1317382, at *9 (E.D.N.Y. Mar. 22, 2019) ("On a motion for summary judgment, the court is not to weigh the evidence . . . or resolve issues of fact, but only to determine whether there are issues to be tried." (quoting *Usavage v. Port Auth. of New York & New Jersey*, 932 F. Supp. 2d 575, 598 (S.D.N.Y. 2013))).

(Pls.' 56.1, Dkt. 59, at 10, ¶¶ 24, 26.)  Moreover, Defendants admit that Defalco's role as a helper ordinarily involved transporting parts, loading and unloading trucks, and working with batteries. (Defs.' 56.1, Dkt. 56, ¶¶ 1–2.)  Thus, a reasonable juror might conclude that a person in Bristow's position acted unreasonably by failing to perform some minimal diligence before accusing Defalco of acting without authorization.  A reasonable juror might also find Bristow unworthy of belief based on evidence that Bristow fabricated his September 27, 2012 report (and subsequent reports) that Seecharan, Sukhee, and Hamilton reported battery thefts to him—information that led to the battery theft investigation in the first place.  (*See* Bristow Dep., Dkt. 60-43, at 55:14–56:16, 57:23–58:6; Dec. 12, 2012 McGovern Mem., Dkt. 60-8, at ECF 5.)

In sum, construing these contested facts in the light most favorable to Plaintiffs, the Court finds that a reasonable juror could conclude that Bristow knowingly made misrepresentations to MTAPD or had no reasonable basis for the report he made against Plaintiffs, and therefore, that he had the requisite intent to falsely accuse Plaintiffs of theft so that they could be arrested.  "It is for a jury to weigh the credibility of the parties, and to determine what the facts are," and "it is for the jury to determine whether [Bristow] genuinely believed the allegations that he made against [Plaintiffs], whether those allegations were false, and whether he made those allegations in a manner that renders him liable for [Plaintiffs'] false arrest."  *Levitz*, 2017 WL 10110881, at *5; *see Rateau*, 2009 WL 3148765, at *6.

At this juncture, the Court also rejects Bristow's argument that the record is devoid of evidence that he "instigated" Plaintiffs' arrests.  (Defs.' Supp. Br., Dkt. 78, at 18.)  During his deposition, McGovern described Bristow as "basically the eyes and ears of all of what was going on at the depot at the time" (McGovern Depo., Dkt. 60-46, at 91:11–18), which is corroborated by other evidence in the record.  Bristow made the initial report of battery thefts at the Depot that led

40

MTA Bus to launch its investigation.  (Defs.' 56.1, Dkt. 56, ¶¶ 6, 8, 9.)  Each day he worked, Bristow counted the number of battery pallets and reported those numbers directly to McGovern. (Bristow Dep., Dkt. 60-43, at 58:7–58:22.)  Bristow provided MTA Bus investigators and the MTAPD with employee phone numbers and work schedules (*see* Pls.' 56.1, Dkt. 59, at 8, ¶ 9), and between September and December 2012, made several reports related to battery theft (Defs.' 56.1, Dkt. 56, ¶ 10).  For example, on October 2, October 27, November 27, and December 7, 2012, Bristow proactively contacted McGovern with either reports from co-workers or his own observations of Pastor, Rodriguez, and Trantel.  (*See* Oct. 12, 2012 McGovern Mem., Dkt. 57-17; Oct. 29, 2012 McGovern Mem., Dkt. 57-12; Nov. 28, 2012 McGovern Mem., Dkt. 57-11; Dec. 7, 2012 McGovern Mem., Dkt. 57-10.)

Then, with respect to the events of December 8, 2012, Bristow contacted McGovern around noon to report that he suspected Plaintiff Trantel was going to remove batteries from the Depot, which prompted McGovern to have Bristow report back with as much information as possible. (Defs.' 56.1, Dkt. 56, ¶ 13; Dec. 10, 2012 McGovern Mem., Dkt. 57-15.)  Bristow followed up with McGovern on December 10, 2012 to report his alleged observations of Plaintiffs, along with his belief that neither was authorized to take batteries from the Depot.  (Defs.' 56.1, Dkt. 56, ¶ 15.) On December 12, 2012, Bristow conveyed this same information to MTAPD.  (*Id.* ¶¶ 21–22.) Nearly three months later, Longaro arrested Plaintiffs based solely on statements by and information from Bristow.  (*See* Longaro Dep., Dkt. 60-44, at 169:12–25, 190:2–12.)  Construing this record in a light most favorable to Plaintiffs, the Court finds that a reasonable juror may well conclude that Bristow's actions went beyond "[m]erely identifying a potential culprit or erroneously reporting a suspected crime, without any other action to instigate the arrest."  *See Anilao v. Spota*, 774 F. Supp. 2d 457, 510 (E.D.N.Y. 2011) (citing *King,* 111 F.3d at 257).

For all these reasons, the Court concludes that there is a genuine dispute as to whether Bristow intended to confine Plaintiffs.[21]    Accordingly, the Court denies Bristow summary judgment on Plaintiffs' false arrest claim against him.

### B.    Malicious Prosecution

Defendants advance three arguments for granting summary judgment to Defendant Bristow on Plaintiffs' malicious prosecution claim against him: (1) Bristow "did not initiate criminal proceedings against [Plaintiffs]" (Defs.' Supp. Br., Dkt. 78, at 20); (2) there is "no support" for Plaintiffs' "conclusory allegation that the termination of the[ir] criminal proceedings shows that they were innocent" (Defs.' Br., Dkt. 55, at 11); and (3) "Plaintiffs cannot establish that [] commencement or continuation [of the prosecution] was done with malice" (Defs.' Supp. Br., Dkt. 78, at 21).[22]    Resolving all ambiguities against Defendants, the Court concludes that summary judgment is inappropriate as there are genuine disputes as to Bristow's role in the commencement of the criminal proceedings, the favorable termination of Plaintiffs' criminal proceedings, and the element of malice.

First, the Court recognizes that Bristow did not sign the criminal court complaints against Plaintiffs (Defs.' 56.1, Dkt. 56, ¶¶ 35–36), and did not expressly pressure the MTA authorities to

---

[21]    The Court also finds that the Circuit's conclusion that a jury could find that Defendant Longaro lacked probable cause to arrest Plaintiffs logically extends to the false arrest claim against Defendant Bristow.

[22]    The Court notes Plaintiffs' argument that Defendant Bristow "waived" the ability to move for summary judgment "on the issue of whether [Bristow] acted with malice" because it was not raised in Defendants' initial motion for summary judgment. (*See* Pls.' Supp. Opp., Dkt. 79, at 16–17.)    It is true that Defendants' initial motion did not expressly raise any arguments about whether Bristow acted with actual malice, even though Defendants now assert otherwise. (*See* Defs.' Br., Dkt. 55, at 17–20; Defs.' Supp. Reply, Dkt. 82, at 10 n.2.)    Nonetheless, the Court addresses this element of Plaintiffs' malicious prosecution claim at this stage for the sake of completeness.

maintain and prosecute charges against them. However, where a malicious prosecution claim is brought against a "layperson," liability may arise where the layperson "is responsible for providing false information or manufactured evidence that influences a decision whether to prosecute." *Gault v. Starling*, No. 15-CV-935 (PKC) (LB), 2017 WL 4354705, at *5 (E.D.N.Y. Sept. 29, 2017) (citation omitted). In short, "[g]iving information to the police that is known to be false qualifies as the commencement of a prosecution." *TADCO Constr. Corp.*, 700 F. Supp. 2d at 270 (quoting *Rivers v. Towers, Perrin, Forster & Crosby Inc.*, No. 07-CV-5441 (DGT) (RML), 2009 WL 817852, at *3 (E.D.N.Y. Mar. 27, 2009)); *see also Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 199–200 (2d Cir. 2014) (affirming determination that defendant, who initiated contact with the police and made multiple false reports, played an active role in initiating criminal proceedings against plaintiff); *Levitz*, 2017 WL 10110881, at *5–6 (denying summary judgment on state law malicious prosecution claim where there was a factual dispute as to whether a "civilian" defendant knowingly lied to the police and the district attorney); *Rateau*, 2009 WL 3148765, at *8–10 (denying summary judgment on malicious prosecution claim after finding, *inter alia*, that a jury may reasonably conclude that defendant "caused the commencement of criminal proceedings against plaintiff" by "falsely reporting" to police that plaintiff made threats against him and by signing a criminal complaint "with false information"); *cf. Shen v. City of New York*, 725 F. App'x 7, 14–15 (2d Cir.) (summary order) (vacating summary judgment on malicious prosecution claim where there was a genuine dispute as to whether defendant made knowing misrepresentations to arresting officers, other police, and prosecutors), *cert. denied*, 139 S. Ct. 78 (2018).[23]

---

[23] The Court acknowledges recent cases holding that the provision of information known to be false may not necessarily qualify as the commencement of a prosecution. *See Watson v. Sims*, 648 F. App'x 49, 52 (2d Cir. 2016) (summary order) (affirming summary judgment for defendants who, even assuming *arguendo* provided false or misleading information to the District Attorney, merely cooperated with the investigation and provided only two documents outside the

As explained above, there is a genuine dispute regarding whether Bristow knowingly made misrepresentations to the MTAPD. *See also Defalco*, 788 F. App'x at 46. Further, construing the record in the light most favorable to Plaintiffs, a reasonable juror could conclude that those alleged misrepresentations prompted the investigation into battery thefts at the Depot (*see* Defs.' 56.1, Dkt. 56, ¶¶ 6–9) and the complaint against Plaintiffs for the alleged events of December 8, 2012 (*id.* ¶¶ 13, 15, 21–22), and formed the sole basis for the criminal complaints against Plaintiffs (*see* Longaro Dep., Dkt. 60-44, at 207:22–209:25). Accordingly, a jury should decide the question of whether Bristow played a sufficiently active role in the commencement of criminal proceedings against Plaintiffs to create liability for malicious prosecution. *See Levitz*, 2017 WL 10110881, at *5–6; *Rateau*, 2009 WL 3148765, at *8–10.

Second, as discussed above, Plaintiffs have introduced sufficient evidence upon which a reasonable juror could find that Plaintiffs' criminal prosecutions were terminated on the basis of a speedy trial violation, which can satisfy the favorable termination element of Plaintiffs' malicious prosecution claim. *See Blount*, 2019 WL 1050994, at *5.

Third, Bristow's argument that "Plaintiffs have failed to adduce a[n]y evidence . . . that [he] acted with an improper motive" or malice also misses the mark. (Defs.' Supp. Br., Dkt. 78, at 21.) As explained above, facts indicating that defendant provided false information to the police "are probative of malice." *See Shen*, 725 F. App'x at 15; *Torres v. Jones*, 26 N.Y.3d 742, 762 (2016) ("[T]he plaintiff may show malice . . . with proof that the defendant falsified evidence in

---

scope of the District Attorney's request); *Fleurimond v. Holder*, 403 F. Supp. 3d 95, 111–14, 114 n.23 (E.D.N.Y. 2019) (granting summary judgment to defendants who allegedly provided false information in the course of the police investigation of a theft complaint that was initiated by someone else). However, the Court finds these cases distinguishable as the undisputed record here contains evidence that Bristow played a more active role in commencing the criminal proceedings against Plaintiffs than did the defendants in these other cases who primarily cooperated with ongoing investigations.

bad faith and that, without the falsified evidence, the authorities' suspicion of the plaintiff would not have fully ripened into probable cause." (citations omitted)). Further, as also explained above, "in the Second Circuit, a jury may infer malice from the absence of probable cause." *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 536 (S.D.N.Y. 2015) (collecting cases); *see Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997) ("[L]ack of probable cause generally raises an inference of malice sufficient to withstand summary judgment."). Consequently, "where a defendant allegedly fabricated the factual basis for probable cause, summary judgment on the malice element . . . is particularly inappropriate." *Franks*, 2015 WL 3533721, at *8; *see also Levitz*, 2017 WL 10110881, at *6 (denying summary judgment on malicious prosecution claim upon finding that "a reasonable juror might conclude that the defendant's [] complaint against the plaintiff [which plaintiff alleged was intentionally falsified] was not supported by probable cause, and instead was motivated by malice").

In light of the genuine dispute over whether Bristow knowingly made misrepresentations to the MTAPD, the Court finds that a reasonable juror could conclude that Bristow's complaint regarding the events of December 8, 2012 was not supported by probable cause, and infer that in making such complaint, Bristow was motived by malice or "a wrong or improper motive, something other than a desire to see the ends of justice served." *Lowth*, 82 F.3d at 573.

Accordingly, the Court denies Defendant Bristow's motion for summary judgment on Plaintiffs' malicious prosecution claim against him.

### C.    Qualified Immunity

Having construed the facts in the light most favorable to Plaintiffs and concluded that a reasonable juror could find Defendant Bristow liable for false arrest and malicious prosecution, the Court now considers whether Bristow is entitled to qualified immunity.

A defendant may be entitled to summary judgment on the issue of qualified immunity where "[t]here is nothing in the record to indicate that [defendant] believed that the information he gave to the police was false or incomplete," because the issue for purposes of qualified immunity is "whether it was objectively unreasonable for [defendant] to *believe* that the information he gave the police was true and complete."  *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 218 n.5 (2d Cir. 2000).  However, summary judgment is not appropriate where there are factual disputes as to whether a defendant knowingly made misrepresentations that, in turn, led to criminal charges because "[a]ny reasonable person, let alone a reasonable government official, should know that such conduct is unlawful and a violation of a person's right not to be arrested and prosecuted without probable cause."  *Rateau*, 2009 WL 3148765, at *7, *9 n.2 (denying qualified immunity for both false arrest and malicious prosecution claims because of a genuine dispute as to whether defendant City employee knowingly provided false statements); *see Pukhovich*, 2018 WL 4688943, at *17 (denying qualified immunity because there were "genuine issues of fact as to whether or not [defendant traffic agent]'s account of plaintiff's actions, which led to plaintiff's arrest and prosecution, was fabricated"); *see also Rogers v. Bisono*, No. 15-CV-6670, 2016 WL 4224072, at *5 (S.D.N.Y. Aug. 9, 2016) ("Defendants cannot be protected by qualified immunity since they allegedly fabricated evidence").

As an initial matter, in 2012, the time of Bristow's complaint regarding Plaintiffs' alleged battery theft, "[t]here is no question that the rights at issue in this case . . . to be free from false arrest [and] malicious prosecution . . . were clearly established."  *Lennon*, 66 F.3d at 423; *see also Manganiello*, 612 F.3d at 164; *Gilles*, 511 F.3d at 245.  And further, while "a case directly on point" is not required, it was also "beyond debate" at that time, *al-Kidd*, 563 U.S. at 741, that someone other than an arresting officer or prosecuting official may violate these rights by

knowingly making a false report that leads to arrest and criminal proceedings, *see TADCO Constr. Corp.*, 700 F. Supp. 2d at 268–71; *Anilao*, 774 F. Supp. 2d at 504–512; *Rivers*, 2009 WL 817852, at \*2–4; *Rateau*, 2009 WL 3148765, at \*5–7, \*8–10.  Accordingly, at the time of Bristow's complaints against Plaintiffs, the "contours" of the rights to be free from false arrest and malicious prosecution based on knowing misrepresentations were "sufficiently clear" such that any reasonable person in Bristow's position would know that making false, incriminating statements to the police violates those rights.  *See Manganiello*, 612 F.3d at 165.

Bristow frames the Court's inquiry as "whether the law was so clearly established that a reasonable person in Bristow's position would understand that the mere act of providing information, mostly to his own employer, regarding what Bristow believed to be a series of unauthorized movement of parts out of the depot amounted to a Constitutional violation."  (*See* Defs.' Supp. Br., Dkt. 77, at 16–17.)  This framing of the issue ignores the evidence put forth by Plaintiffs.  Construing the disputed facts in the light most favorable to the Plaintiffs, it is clear that Bristow's characterization of his conduct is genuinely disputed.  As has been amply discussed above, the Court concludes that a reasonable juror could find that Bristow played a proactive role in initiating the arrests of and criminal proceedings against Plaintiffs, and as the Circuit has already determined, "[a] reasonable juror could find that Bristow knowingly made misrepresentations *to MTA police*," the arresting authority in this matter.  *See Defalco*, 788 F. App'x at 46 (emphasis added).

Because there remains a genuine dispute as to whether Bristow knowingly made misrepresentations to the MTAPD regarding Plaintiffs' participation in an alleged battery theft on December 8, 2012—a dispute that is central to the question of whether or not it was objectively reasonable for Bristow to believe that his conduct was lawful—the Court declines to find that

Bristow is entitled to qualified immunity as a matter of law.  Therefore, Bristow is denied qualified immunity at this time.

## CONCLUSION

For the reasons contained herein, the Court denies Defendants' motion for summary judgment and motion to strike.  The parties are directed to file a joint pre-trial order, in accordance with this Court's Individual Rules, within sixty (60) days of the date of this Memorandum and Order.

SO ORDERED.

*/s/ Pamela K. Chen*

Pamela K. Chen
United States District Judge

Dated: February 16, 2021
       Brooklyn, New York